**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **FRANK JOHNSON,** | **CIVIL ACTION** |
| **Plaintiff,** | |
| **v.** | |
| **VERIZON SERVICES CORPORATION** | **NO.  16-1023** |
| **and VERIZON DATA SERVICES LLC,** | |
| **Defendants.** | |

**DuBois, J.**                                                                                          **April 18, 2017**

## M E M O R A N D U M

### I.     INTRODUCTION

In this employment discrimination case, plaintiff Frank Johnson alleges that he was terminated by defendants, Verizon Services Corporation and Verizon Data Services LLC, (collectively "Verizon") because of his race.  Johnson, the only African-American employee in his department, was terminated during a reduction-in-force after a thirty-three year career at Verizon.  Johnson asserts claims of race discrimination and retaliation under 42 U.S.C. § 1981 and the Philadelphia Fair Practices Ordinance, Phila. Code §§ 9-1100.  Verizon has filed a motion for summary judgment.  For the reasons that follow, Verizon's Motion for Summary Judgment is denied.

### II.    BACKGROUND

The relevant facts as set forth in evidence submitted by the parties are as follows. Johnson's career at Verizon began in May 1979 when he was hired as a Service Representative by Verizon's predecessor.  SOF ¶ 1.  Johnson spent his first twenty-eight years with Verizon filling various positions, including systems analyst and, after promotion, tech manager.  Pl. SOF ¶ 9; Resp., Ex. A, Dep. of Frank Johnson ("Johnson Dep."), Nov. 21, 2016, 27:21-25.  In 2009,

Johnson began working in Verizon's IT Data Security Department on the code review team, where he was responsible for identifying errors and vulnerabilities in computer applications, recoding, and performing other duties. Pl. SOF ¶¶ 11, 16.

The proficiency rankings of employees on the code review team started with Member Technical Staff (MTS), progressed to Senior Member Technical Staff (SMTS), and culminated in Distinguished Member Technical Staff (DMTS). Pl. SOF ¶ 13, fn. 2. Johnson was initially classified as an SMTS but was promoted to DMTS, the highest ranking available in the IT Department. Pl. SOF ¶ 13. To achieve this promotion, Johnson's performance had to be rated "above satisfactory." Pl. SOF ¶ 14. Johnson was the highest ranked member of the code review team. Pl. SOF ¶ 32.

From approximately 2010 to 2013, Johnson worked under the supervision of George Turrentine, manager of application security. Pl. SOF ¶ 15. During this period, Johnson claims that Turrentine treated and interacted with white employees in a friendlier and more professional manner than he did with non-white employees. Pl. SOF ¶ 29. In Johnson's 2010 performance review, Turrentine commented that Johnson produces "good solid work," and that he was "beginning to share his wealth of experience and skills—helping to grow the team. I believe he downplays his involvement and expertise—his humbleness and quiet strength of knowledge is refreshing." Resp., Ex. L. Two years later, in June 2012, Turrentine stated in Johnson's performance review that "[Johnson] is a very talented employee—with a wealth of knowledge and experiences." Resp., Ex. N.

Despite these positive reviews, Johnson was notified on January 17, 2013, that he would be terminated, effective February 15, 2013, as part of a reduction-in-force ("RIF"). Pl. SOF

¶¶ 35-36.[1]  While Turrentine states that he considered all of the employees on the code review team for termination, no other member was fired.  Pl. SOF ¶¶ 37-39.  The five retained team members performed similar work to Johnson, were supervised by Turrentine, had less experience than Johnson, and were not African-American.  Pl. SOF ¶¶ 40-43.  In determining who to terminate as part of the RIF, Turrentine did not use any specific standard because he "owned the department so [he] knew what was required to do [the] job."  Turrentine Dep. 39:20-23.  Instead, he "put together a table of pros and cons on all the employees."  *Id.* at 37:4-6.  On that list, Turrentine claims that he wrote Johnson "lack[ed] knowledge of distributed systems and that include[d] their languages."[2]  *Id.* at 38:20-22.  Turrentine destroyed the list approximately six months after Johnson's termination because Verizon's "retention policy says that [employees] have to clear out stuff after a certain period of time."  *Id.* at 37:16-23.  Accordingly, no physical record of why Johnson was terminated exists.

On January 31, 2013, days after Johnson was informed of his imminent termination, Turrentine rated Johnson as "performing," indicating that he met objectives, requirements, and expectation, and periodically exceeded them.[3]  Resp., Ex. O.  He also commented that Johnson "continues to be a very talented employee—and has improved in his sharing of information."  *Id.*

---

[1] Turrentine contends that he had previously spoken with Johnson because "[Johnson] was not quite as proficient and not providing exactly what we needed in the way of output."  Resp., Ex. P, Dep. of George Turrentine (Turrentine Dep."), 27:22-24; 28:1-9.  However, Turrentine did not memorialize these alleged conversations in writing, did not make any notes, and does not recall the dates of the conversations.  *Id.* at 28:8-13.  Johnson disputes that these conversations ever occurred.

[2] Johnson contends that he did know the coding languages necessary for his position.  As evidence, he points to his certification in client server/distributed systems and his completion of certified information systems security professional training.  Pl. SOF ¶ 18-20.

[3] Johnson received "performing" ratings during his entire tenure on the coding team under Turrentine's supervision.  Pl. SOF ¶ 27.  Verizon argues that Turrentine rated everyone on the team as "performing."  SOF ¶ 82.

On March 3, 2016, Johnson filed suit, alleging discrimination on the basis of race and retaliation under 42 U.S.C. § 1981 and the Philadelphia Fair Practices Ordinance. Verizon filed its Motion for Summary Judgment on March 3, 2017. As stated in his Response, Johnson "has decided not to proceed on his retaliation claim." Pl. SOF ¶ 6, fn. 1. Thus, the Court will only consider Johnson's race discrimination claim in this Memorandum.

## III. APPLICABLE LAW

The Court will grant summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). A fact is material when it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The Court's role at the summary judgment stage "is not . . . to weigh the evidence and determine the truth of the matter but to determine whether . . . there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* at 249. In making this determination, "the court is required to examine the evidence of record in the light most favorable to the party opposing summary judgment, and resolve all reasonable inferences in that party's favor." *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007). However, the party opposing summary judgment must identify evidence that supports each element on which it has the burden of proof. *Celotex Corp.*, 477 U.S. at 322.

Johnson's claims of race discrimination under 42 U.S.C. § 1981 and the Philadelphia Fair Practices Ordinance are governed by the same legal standard applicable to claims brought under Title VII of the Civil Rights Act of 1964. *Jones v. Sch. Dist. of Phila.*, 198 F.3d 403, 410 (3d

Cir. 1999); *Joseph v. Continental Airlines, Inc.*, 126 F. Supp. 2d 373, 376 n.3 (E.D. Pa. 2000).

Claims of race discrimination under Title VII are evaluated using the *McDonnell Douglas* three-step framework. *Jones v. Se. Pa. Transp. Auth.*, 796 F.3d 323, 325-26 (3d Cir. 2015). The Court first evaluates "whether the plaintiff has stated a prima facie case of discrimination or retaliation; if [the plaintiff] has, [the Court] ask[s] whether the employer has advanced a legitimate reason for its conduct; and finally [the Court] give[s] the plaintiff an opportunity to prove that the employer's proffered reason is pretextual." *Id.* at 326.

## IV.     DISCUSSION

Johnson alleges that Verizon discriminated against him on the basis of race by selecting him for termination during the RIF. Verizon argues that it terminated Johnson during a RIF because he was the least valuable member of the coding team and had performance issues. The Court considers each step of the *McDonnell Douglas* framework in turn.

### A.     Prima Facie Case

The Court concludes that Johnson has established a prima facie case of race discrimination. To establish a prima facie case in suits involving a RIF, a "plaintiff must show that (1) [he] belonged to a protected class, (2) [he] was qualified for the position from which [he] was terminated, (3) [he] was terminated, and (4) persons outside of the protected class were retained." *In re Carnegie Ctr. Assocs.*, 129 F.3d 290, 294-95 (3d Cir. 1997); *see also Jackson v. Temple Univ. Hosp., Inc.*, 501 F. App'x 120, 122 (3d Cir. 2012). Johnson is African-American and thus a member of a protected class. The parties do not dispute that he was terminated by Verizon and only non-African-American employees on the coding team were retained. SOF ¶¶ 91, 81. Thus, the only element of the prima facie case at issue is whether or not Johnson was qualified for his position.

A "plaintiff's qualifications for purposes of proving a prima facie case" are determined by an objective standard. *Sempier v. Johnson & Higgins*, 45 F.3d 724, 729 (3d Cir. 1995). "While objective job qualifications should be considered in evaluating the plaintiff's prima facie case, the question of whether an employee possesses a subjective quality, such as leadership or management skill, is better left to consideration of whether the employer's nondiscriminatory reason for discharge is pretext." *Id.* In this case, Johnson was employed by Verizon for thirty-three years prior to his termination; he worked on the coding team for approximately three years and only received positive reviews during that time. He also obtained the highest proficiency ranking available. These achievements persuade the Court that Johnson was qualified for the position from which he was terminated using an objective standard.

B.     Legitimate, Nondiscriminatory Reason

Because Johnson has stated a prima facie case of discrimination, the burden shifts to Verizon to articulate a legitimate, nondiscriminatory reason for his termination. The Court concludes that Verizon has done so. Verizon contends that Johnson was terminated because he was ranked lowest in the coding group "with respect to his coding skills necessary for the code review job and . . . other employees possessed Johnson's primary expertise, i.e. mainframe computing systems and languages." SOF ¶ 90. Johnson does not dispute that Verizon provides a legitimate, nondiscriminatory reason for his firing.

C.     Pretext

The Court now considers whether Verizon's stated reason for Johnson's termination was pretext and concludes that Johnson provided sufficient evidence from which a factfinder could reasonably disbelieve Verizon's legitimate, nondiscriminatory reason for his termination. Under the third step of the *McDonnell Douglas* framework, an employee must "show that the

employer's articulated reason was a pretext for intentional discrimination." *Doe v. C.A.R.S.*

*Prot. Plus, Inc.*, 527 F.3d 358, 364 (3d Cir. 2008). A plaintiff "must point to some evidence,

direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the

employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason

was more likely than not a motivating or determinative cause of the employer's action." *Fuentes*

*v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994). A plaintiff cannot simply show that an

> "employer's decision was wrong or mistaken, since the factual dispute at issue is
> whether discriminatory animus motivated the employer, not whether the employer
> is wise, shrewd, prudent, or competent. Rather, the nonmoving plaintiff must
> demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or
> contradictions in the employer's proffered legitimate reasons for its actions that a
> reasonable factfinder could rationally find them unworthy of credence."

*Jones*, 198 F.3d at 413. But "[i]f a plaintiff comes forward with evidence that would cause a

reasonable factfinder to find the defendant's proffered reason unworthy of credence, [he] need

not adduce any evidence of discrimination beyond [his] prima facie case to survive summary

judgment." *Burton v. Teleflex Inc.*, 707 F.3d 417, 430 (3d Cir. 2013).

Johnson's evidence concerning pretext can be grouped into two main categories: (1)

employment performance evidence suggesting that Johnson was an "exemplary employee," and

(2) evidence that allegedly shows inconsistencies regarding Turrentine's selection process for the

RIF termination. Resp. at 12-13. The Court considers each category in turn.

As to the first category, Johnson points to his positive performance reviews, lack of a

disciplinary record, long history with Verizon, and certifications as evidence that Verizon's

legitimate, nondiscriminatory reason is pretext. But while lack of criticism of an employee's

performance and positive reviews can be relevant to a pretext analysis, they are not sufficient,

standing alone, to defeat a motion for summary judgment. *Sempier*, 45 F.3d at 731-33. Johnson

offers evidence that he received positive performance reviews for his entire tenure on the coding

team, including a positive review issued just days after he was informed of his impending termination. Johnson was ranked as the most proficient member of the team, and was commended for his "wealth of knowledge and experiences." Resp., Ex. N. Johnson also states that he learned to code in and read C in 1995 and learned how to read other coding languages, C, C#, C++, after his transfer to the coding team. Resp., Ex. A, 195:6-25; 196:1-12. Johnson has a certification in client server/distributed systems and went through certified information systems security professional training. Although Turrentine contends that he spoke with Johnson about negative performance issues, Verizon offers no written evidence of those conversations.

As to the second category, Johnson argues Turrentine has given inconsistent and unbelievable explanations regarding the documents he relied on in effectuating the RIF and the factors that he considered. Resp. at 13. The Court is unconvinced by this argument. It appears that Turrentine's justification for terminating Johnson—both that Johnson was less experienced in the coding languages most used by the team and performed in a subpar manner—remained consistent throughout Turrentine's statements. Minor inconsistencies, such as whether Turrentine relied on a pro and con list he created or partially relied upon performance reviews, are not sufficient to demonstrate pretext.

However, there is a lack of documentation concerning Johnson's termination and the criteria used in evaluating employees on the coding team for the RIF. "Subjective evaluations are more susceptible of abuse and more likely to mask pretext." *Goosby v. Johnson & Johnson Med., Inc.*, 228 F.3d 313, 320 (3d Cir. 2000). Turrentine states that no criteria were provided by Verizon for implementation of the RIF. Instead, Turrentine states that he crafted a pro and con list for each employee. However, that list was destroyed approximately six months after Johnson's termination.

This Court only has before it dueling narratives provided by Johnson and Turrentine as to the motivation for Johnson's termination. Therefore, a genuine dispute of material fact remains as to pretext. Although a close case, the Court concludes that Johnson "is entitled to have this credibility dispute resolved by a jury." *Sanders v. Nicholson*, 316 F. App'x 161, 166-67 (3d Cir. 2009).

## V.    CONCLUSION

For the foregoing reasons, Verizon's Motion for Summary Judgment is denied. An appropriate order follows.